Filed 1/18/24

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>   v.<br><br>DARLENE RENEE FOUSE,<br><br>   Defendant and Appellant. | F085131<br><br>(Super. Ct. No. 1063488)<br><br><br>**OPINION** |

APPEAL from an order of the Superior Court of Stanislaus County.  Ricardo Cordova, Judge.

Brad Kaiserman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Galen N. Farris, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Defendant Darlene Renee Fouse appeals from the order following the grant of her Penal Code section 1172.6 petition for resentencing.  (Undesignated statutory references

are to the Penal Code.)  Defendant was convicted by a jury in April 2006 of two counts of attempted murder of a peace officer, three counts of first degree robbery, one count of assault likely to cause great bodily injury, and one count of conspiracy to commit first degree robbery.  After petitioning for resentencing under section 1172.6, defendant was found not culpable for the attempted murders under the amended law (she was the getaway driver).  The court vacated the two convictions for attempted murder of a peace officer, redesignated the offenses as two counts of assault with a firearm on a peace officer, and added a conviction for felony evading a peace officer under the redesignation procedure provided in section 1172.6, subdivision (e).

Because the jury convicted defendant of the target offenses of robbery, she argues the trial court erred in redesignating the attempted murders as assaults with a firearm on a peace officer (lesser included offenses) and in adding a conviction for evading a peace officer.  Instead, she contends the resentencing procedure provided in subdivision (d)(3) of section 1172.6 applied and limited resentencing to the robbery target offenses of which she was charged and convicted.  The People argue the trial court did not err in applying both the resentencing and redesignation procedures under section 1172.6.

In reviewing the plain language of section 1172.6, subdivisions (d)(3) and (e), we agree with defendant.  Since it is undisputed she was charged and convicted of the target offenses, the statute required the court to resentence defendant on the remaining charges. It did not permit the court to also redesignate the attempted murder convictions to assault with a firearm on a peace officer and felony evading a police officer.  Consequently, we reverse the court's order and remand for further proceedings consistent with this opinion.

### FACTUAL AND PROCEDURAL HISTORY

Following a series of violent home invasion robberies, a jury convicted defendant in 2006 of three counts of first degree residential robbery in concert (§§ 211, 212.5, subd. (a), 213; counts 32, 33, 34), one count of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1); count 35), two counts of attempted murder of a

2.

peace officer (§§ 187, 664, subd. (e); counts 36, 37), and one count of conspiracy to commit residential robbery (§§ 182, 212.5, subd. (a); count 38).  She was sentenced to two consecutive terms of life in prison with the possibility of parole on the attempted murder counts, plus a determinate term of 11 years, composed of six years for one robbery, two years for each of the other two robberies, and one year on the assault charge.  All terms were ordered to run consecutively, and a five-year term was imposed and stayed on the conspiracy conviction.

Our court affirmed defendant's convictions but modified her sentence in the unpublished opinion, *People v. Fouse* (Mar. 13, 2009, F050427) [2009 Cal.App.Unpub. LEXIS 2102; 2009 WL 638777], which also details the facts underlying defendant's convictions.  The opinion includes a synopsis of the counts with which defendant was not charged, but with which her codefendants Anthony Lawrence Martinez, David Wayne Morrison, and David Anthony Silva were charged and convicted, in order to give context to some of the issues defendant raised.  As to the charges against defendant, it provided in relevant part:

"*Counts 32-35-September 10, 2003*

"In September 2003, [H.G. Sr.] resided … with his wife …, 14-year-old daughter …, and 23-year-old son [H.G. Jr.]  [H.G. Sr.], a farm manager, had an office at his residence, as well as one at his work site.  An alarm system that was connected to a security company and the sheriff's department had been installed at the house on September 9.

"At approximately 2:20 a.m. on September 10, [H.G. Sr.] got up to see his wife off to work and to check on some water he had running in his orchard.  Everything seemed fine.  Around 3:30 a.m., he was asleep when the alarm went off.  Thinking there was a problem with the installation, he was hurrying to turn off the alarm, the control panel for which was by the front door, when three intruders entered the house by breaking open the dead-bolted front door.  One held a shotgun to [H.G. Sr.]'s head and said that if he did not quickly turn off the alarm, the intruder would '"blow [his] brains out."'  The intruder repeated this and banged [H.G. Sr.]'s head with

the butt of the shotgun multiple times. [H.G. Sr.] was able to tell the intruders were wearing masks. He heard three male voices.

"[H.G. Sr.] managed to turn off the alarm. The intruders took him into the living room, where he was placed face down on the floor, his hands and ankles were restrained with black plastic ties, and his head was covered. As one of the intruders ran down the hallway toward the children's rooms, another put his foot to [H.G. Sr.]'s neck, applied pressure, and asked him where the money was. The shoe felt heavy. The intruder told [H.G. Sr.] that his son was covered in blood, and that if he loved his son, he would tell the intruder where the money was. [H.G. Sr.] told him that there was money in his wallet in the laundry room. The intruder then asked where the 'clavo' was. In the Spanish culture, 'clavo' is a slang term that means 'stash.' [H.G. Sr.] understood it to mean money or jewelry, and he told the intruder that he did not know what he was talking about. The intruder then got angry and kicked [H.G. Sr.] in the side of the face.

"Meanwhile, [H.G. Jr.] was awakened when his locked bedroom door was kicked in. What appeared to be a shotgun and a flashlight were pointed at him. He could hear the alarm in the background. It went off after 15 to 25 seconds. [H.G. Jr.] was told to lie face down on his stomach, and his wrists and ankles were restrained with black zip ties and a blanket was thrown over him. [H.G. Jr.] could hear three male voices. The intruders spoke in English, except that [H.G. Jr.], who understood Spanish, heard the term 'ese' four or five times when one intruder addressed another. The two intruders in his room used the term and seemed to have Hispanic accents.

"[H.G. Jr.] heard one of the intruders tell his sister to get up and then to get on the ground. He then heard what sounded like someone being struck. Although he did not hear his sister make any sound, he yelled out not to hurt her, that she was only 14. The intruders repeatedly asked [H.G. Jr.] where the money was; when he insisted there was no cash in the house, he was kicked a few times in the back of his head with something that felt sturdy, like a boot. At some point, [H.G. Jr.] could hear his father insisting that there was no money. When the intruders were asking [H.G. Jr.] where the money was, they said that if he was lying, his father was going to get hurt worse, and that [H.G. Jr.] should look at him, that he was bleeding all over. [H.G. Jr.] knew they were lying, because he could hear his father and had not heard him being struck or asking not to be hit.

"Eventually, one of the intruders asked [H.G. Sr.] how to turn off the front lights. [H.G. Sr.] told him the location of the switch, then heard a car

4.

nearby that sounded like its muffler was torn up. The car was leaving. The house was quiet then. [H.G. Jr.], who had been left alone in his room after it was searched and items were taken, managed to free himself and then his father and sister. They discovered the telephones were missing from the wall and their cell phones were in the toilet, so [H.G. Jr.] activated the panic button on the alarm to summon help.

"The incident lasted 40 to 50 minutes, during which the house was ransacked. The intruders took a number of items, including jewelry, money, and a video camera. Authorities recovered some of the items following the arrests in this case. [H.G. Sr.] suffered cuts and bruises to his head and face from being kicked and struck with the gun butt. He also had bloody marks on his ankles from having his feet tightly bound. [The daughter] sustained a facial abrasion and marks on her wrists and ankles. [H.G. Jr.] had marks on his wrists and ankles that were visible for about a month. None of the family sought medical attention.

"Shoe prints were found between the residence and the road. Boots subsequently seized from Silva could not be excluded as the source of some of the impressions. Boots subsequently seized from Martinez could not be excluded as the source of other of the impressions. There were tire tracks in the orchard near the house that appeared to go from the road, into the orchard, and then out onto the road again. The shoe prints led toward the area where the tire prints were found.

"*Counts 36-37-September 10, 2003*

"Early on the morning of September 10, 2003, Stanislaus County Sheriff's Detective Nuno was assigned to be part of the arrest team, if residential robbery suspects, who were under surveillance, committed a robbery. Sergeant Allen, who was the team supervisor, was with Nuno in one vehicle, while the rest of the SWAT team and a couple of other detectives were in other vehicles. Nuno and Allen were in an unmarked car that was equipped with lights and a siren. Nuno was driving.

"At approximately 4:30 a.m., Nuno and Allen were at the staging area …, when they received information that the individuals were believed to have committed a residential robbery in the area. The surveillance team reported the suspects' location; Nuno had previously been informed that the suspect vehicle was brownish or golden and had the words 'Cold Pimp'n' on the back.

"Nuno and Allen, who were in the lead vehicle, and the rest of the arrest team moved to intercept the suspects. Once the team was in position,

Nuno activated his lights and siren. The suspect vehicle slowed down as if it was going to stop, but then accelerated. A pursuit ensued that covered seven to 10 miles and lasted approximately 10 minutes.

"Nuno followed the vehicle from a rural area into a residential neighborhood in Turlock. There, the car slowed down and began making turns. The rear doors opened a couple of times, then, … near the intersection of Angelus and Spruce, the vehicle slowed almost to a stop. Nuno slowed down as well, and pulled toward the driver's side passenger area of the vehicle. The right rear door opened completely, and Martinez got out. He was wearing black clothing, a black beanie-type hat, black boots, and a bandolier, and had a shotgun in his hand. As he turned toward Nuno and Allen, the shotgun also turned in their direction. Allen opened his door, stepped half out of the car, which was still moving, and fired several shots at him. Because Allen was behind the door of the car and the window was not rolled down, he fired through the window, which shattered. The shots also damaged the vehicle's outside mirror. The Cold Pimp'n vehicle was about 10 to 15 feet in front and to the right of his and Nuno's position at that point. As Martinez ran toward a residence on the south side of Angelus, Allen reacquired the target, stood up, and fired again. He was standing behind the door of his and Nuno's car, which was now slightly rolling away from him.

"Immediately after Allen fired the second time, he and Nuno heard loud booms, which Allen believed to be gunfire. They were coming from the suspect vehicle, toward Allen. Allen had stepped out of the car in which he had been riding, and was standing right next to it. He was still somewhat in the doorway, with the car moving away from him. When he first heard the gunshots, Nuno's car had not completely cleared his position. The suspect vehicle was still in front of Nuno's car, approximately four to five car lengths away. The lower driver's side portion of Nuno's windshield broke, and he realized he was being shot at. Glass from the windshield cut his left cheek, and the bullet, which struck the driver's side door frame, was probably inches from his face. Nuno heard several booms. Allen heard two or three shots. Nuno was not sure which shot hit the windshield, but it was neither the first nor the last.

"As this was going on, the suspect vehicle started to move. Nuno accelerated to catch up to it, and Allen followed Martinez. At the intersection of Angelus and Spruce, approximately 100 yards from where Martinez had exited the vehicle, the two passenger side doors opened. As the car was either completely stopped or moving slowly, Morrison got out of the rear passenger side. Nuno did not see anything in his hands. Silva

6.

got out of the front passenger side.  He was dressed in dark clothing and holding a chrome-colored handgun.

"Because Silva was holding a firearm, Nuno positioned his car at an angle and began to shoot at him through the broken-out passenger window.  He could not tell whether any of his shots struck Silva, who disappeared into the darkness, as did Morrison.  Having lost sight of them, Nuno came around the driver's side of the suspect vehicle, at which point he saw the driver exit.  It was Fouse.  Nuno gave chase as she ran into a yard across the street, then took her into custody without further resistance.

"Fouse was taken into custody around 4:45 a.m.  A subsequent search of the vehicle revealed a number of items that the [H.G. Sr. family] later identified as belonging to them, as well as a black baseball cap and black ski mask.  The ski mask had two eyeholes, and a mouth opening that had been closed by some means.  A camouflage hood was found on the rear floorboard.  A shotgun was found in the front yard of [a] residence [on] Angelus, where Martinez had jumped the fence into the backyard and fled from Allen.  In the backyard was a bandolier with shotgun shells in it.

"[Stanislaus County Sheriff's Deputy] Ward assisted in taking Silva into custody about 5:30 or 6:00 a.m.  Silva was hiding in the carport of [a residence on] South Orange Street.  When apprehended, he had a cell phone in his hand.  Eight black plastic zip ties, each individually secured in a loop, were found underneath the vehicle where Silva had been hiding.  Although Silva only had a pocketknife on his person, two black nine-millimeter magazines for a semiautomatic weapon were found in the backyard of the residence, about 15 to 20 feet from the carport.  One contained 10 rounds and the other contained nine.  A black Browning High-Power semiautomatic handgun with a magazine in it was subsequently located in the backyard of [a neighboring residence on] Spruce.  The two backyards were separated by a fence with a gap in it, and the two magazines were some six to 10 feet from the black handgun.

"Although the black handgun was photographed where found and Deputy Luck, then a Stanislaus County Sheriff's Department trainee, was assigned to watch the evidence in the area, the gun was no longer there a couple of hours later when sheriff's personnel returned to collect it, and Luck was no longer in the immediate area.  A resident of the house agreed to assist Deputy Reed, Luck's field training officer, in trying to recover the handgun.  The following day, this person directed Reed to an apartment complex in Turlock and retrieved what appeared to be the gun.  A check of the weapon's serial number revealed it had been taken in the [Jimmy L.] robbery.  Subsequent comparison revealed that one of the unfired cartridges

in the magazines found in the backyard [of a residence on] South Orange most likely was cycled through this gun.

"A silver-colored Smith and Wesson .357-caliber revolver was found in an adjacent backyard [on] South Orange. The revolver, which was capable of holding six rounds, contained six empty shell casings.

"Nuno assisted in capturing David Michael Silva, who was hiding in a duplex laundry room on Spruce, near Angelus. David Michael Silva was taken into custody between 6:00 and 7:00 a.m.

"Just before 8:00 a.m., Stanislaus County Sheriff's Detective Cook found Martinez hiding in the backyard of [a] residence … at the corner of South Avenue and South Orange Street. A black zip tie and a loaded Mossberg 12 gauge shotgun (also known as a Moss) were recovered from the area in front of [a] residence [on] Angelus. A black strap containing 12 gauge shotgun rounds was found in the backyard of the residence.

"Around 1:30 p.m., Morrison was taken into custody inside [a] residence [on] South Avenue." (*People v. Fouse, supra*, F050427, fns. omitted.)

The jury was instructed in relevant part, in order to find defendant guilty of the crime of attempted murder as charged in counts 35 and 36, or lesser included offenses thereof, they must be satisfied beyond a reasonable doubt that: (1) "The crime of robbery was committed;" (2) "That the defendant aided and abetted that crime;" (3) "That a co-principal in that crime committed the crime of … attempted murder, or lesser included offenses thereof;" and (4) "The crimes of … attempted murder, or lesser included offenses thereof were a natural and probable consequence of the commission of the crime of robbery."

### Petition for Resentencing and Evidentiary Hearing

On January 4, 2022, defendant filed a petition for resentencing pursuant to section 1172.6 (former § 1170.95).[1] Following an evidentiary hearing held on September 26–27,

---

[1]Effective June 30, 2022, the Legislature renumbered then effective section 1170.95 to section 1172.6. (Stats. 2022, ch. 58, § 10.) There were no substantive changes to the statute at that time, although prior changes had been implemented effective January 1, 2022. There is no

2022, the trial court concluded defendant could no longer be guilty of attempted murder under California law as amended by the changes to section 188 or 189 made effective January 1, 2019, and, accordingly, vacated her attempted murder convictions.

At the evidentiary hearing Roy Pettit, who was with the Stanislaus County Sheriff's Department in September 2003, testified regarding his involvement in an aerial surveillance team that was assisting the sheriff's department in an investigation they were conducting regarding a series of robberies. He was an observer in an aircraft that was surveilling a car, a Buick with a big "Cold Pimp'n" insignia on the back window on September 10, 2003. The car was parked in an orchard across the street from a house and it was "blacked out," meaning its lights were off. He turned on a video machine on the plane to start recording. The camera used forward looking infrared (FLIR) that records whatever the camera sees and interprets; the camera sees heat and light in a range the human eye cannot detect. The People then introduced the surveillance footage at the hearing.

Former Stanislaus County Sheriff's Detective Marcelino Nuno testified regarding his encounter with the same Buick with the "Cold Pimp'n" insignia on the back window. He explained the Buick was involved in a high-speed pursuit on September 10, 2003. Nuno had information a home had been invaded immediately preceding the pursuit of the Buick.

Defendant was driving the Buick during the pursuit. Nuno was driving a law enforcement vehicle and Sergeant Lloyd Allen was in his car. Nuno explained he activated his emergency vehicle lights, believing the people they had been following the previous 30 days were in the Buick, namely, David Silva, David Morrison, and Anthony Martinez. The Buick ran through stoplights and stop signs. At some point shots were

_____

dispute in this case that turns on any of these changes. For purposes of clarity, we refer to the statute as section 1172.6.

9.

fired from the Buick. Nuno explained they got on Spruce and "people started exiting the car after one of the occupants[, identified as Martinez,] exited the vehicle. As it was taking off, shots were being fired from the vehicle." Martinez ran towards a residence after exiting the vehicle. Allen fired shots at Martinez. Then, Silva fired four to five shots and one of the rounds hit Nuno's front windshield, "[k]ind of directly in front of" Nuno; he was behind the steering wheel driving. The bullet ended up lodged in the doorframe of the driver's side door. Nuno suffered a cut to his upper cheek but was not seriously injured. Allen was transitioning out of the car when the shots were fired. Allen also shot at the second passenger who exited the vehicle.

The car in front of Nuno continued forward to the T-intersection of Angelus and Spruce at a high rate of speed and eventually stopped. Nuno saw David Silva, the front passenger of the vehicle, get out next; he was holding a chrome handgun. The rear passenger, identified as Morrison, also got out of the same side of the vehicle. The car continued to move when they exited. Silva glanced in Nuno's direction and was running. Nuno positioned his vehicle to the left side of the car, grabbed his rifle, placed it out the passenger side window, and shot a couple rounds toward Silva. Allen was back where Martinez had exited the vehicle. Seconds after Morrison, Martinez, and Silva got out of the Buick, the car stopped and defendant got out of the driver's seat. Defendant ran in an easterly direction into a yard and Nuno followed her on foot. He eventually caught up to her and she stopped on his command. Nuno did not see anything in defendant's hands and she did not make any aggressive moves toward him. Nuno was aware that Silva and Martinez abandoned their weapons prior to being arrested and Nuno testified he did not have information that anybody other than Silva fired on anyone at the scene.

Following the presentation of evidence at the evidentiary hearing, the court concluded it did not find that defendant would have been convicted of attempted murder on both of the officers based on the current law. The court reasoned there was "no evidence here that [defendant] encouraged the shooting or did anything to make the

shooting easier." Thus, the court concluded, it "would find the defendant did not have the intent to kill. She did not do anything to assist the conduct of the aider and abettor." The court found defendant's actions after Silva shot showed she was trying to get away rather than aiding or abetting or encouraging Silva to fire a weapon at the officer.

### *Redesignation of Attempted Murder Convictions*

In considering resentencing after the evidentiary hearing, the court stated *People v. Silva* (2021) 72 Cal.App.5th 505 held subdivision (e) of former section 1170.95, now section 1172.6, "appears to invest the superior court with considerable discretion in redesignating the petitioner's murder convictions as underlying felonies and resentenc[ing] a petitioner to an appropriate term of years based on his or her individual capability [*sic*]." The court stated it did not recall if the jury was instructed on assault with a firearm as a lesser offense to the attempted murder, but the court thought it was "really what happened here." That is, defendant "may have abetted in the assault on a peace officer with a firearm, and that does not require the specific intent to kill."

Based on this conclusion, the court indicated it was inclined to sentence defendant to two lesser counts of assault with a firearm on a peace officer (Pen. Code, § 245, subd. (d)(1)), a strike offense, for a term of two years consecutive for each victim (one-third the midterm of six years), for a total of four years. The court also indicated it believed it was appropriate to sentence defendant to a consecutive sentence of an additional eight months for evading a peace officer (Veh. Code, § 2800.2), but it did not know whether defendant had adequate notice of this. The court stated, though "the defendant has not been provided notice of that in terms of any pleading," it "is not a surprise" based on the evidence. The court permitted the parties an opportunity to brief the issue regarding its proposed redesignation.

On September 30, 2022, the court held another hearing at which defendant's counsel argued the attempted murders should not be redesignated as assaults with a firearm on a police officer. In support, counsel argued defendant had no firearm and the

11.

court must find sufficient evidence beyond a reasonable doubt under an aider and abettor theory. However, there was no evidence defendant had knowledge of Silva's intentions or that defendant specifically intended to assist Silva. Additionally, there was no action on defendant's part to do so. Defense counsel asserted defendant did "nothing other than what she had been doing the entire time, which is driving," and the court made factual findings that defendant's intent was to evade officers.

The court reiterated the disposition it deemed appropriate and noted the jury was provided instructions that allowed it to find defendant not guilty of attempted murder and consider the assault with a firearm. The court stated the statute "does allow if it's related to the charged offense—charged action here is … Silva firing a weapon at the two officers." The People agreed with the court that there was sufficient evidence in the record and that defendant had notice of the assault with a firearm charge.

The court then ordered counts 36 and 37 be redesignated as assault on a peace officer using a firearm on an aiding and abetting theory and that defendant be sentenced to two years (one-third the midterm of six years) consecutive, as to each count. The court also added a violation of Vehicle Code section 2800.2 for felony evading a police officer as count 40 and sentenced defendant to eight months (one-third the midterm of two years), plus additional fees or fines for the added conviction. Accordingly, defendant's new aggregate sentence was 14 years 8 months. The court noted defendant had been in custody more than 14 years 8 months and told defendant the California Department of Corrections and Rehabilitation would send her back, process her, and give her parole instructions.

## DISCUSSION

### I.     Senate Bill No. 1437 and Senate Bill No. 775

On September 30, 2018, the Governor signed Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), which became effective on January 1, 2019. Senate Bill

1437 "amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)  It amended section 188, which defines malice, and section 189, which defines the degrees of murder to address felony-murder liability. (Stats. 2018, ch. 1015, §§ 2–3.)

Accordingly, section 188 now provides that, "[e]xcept as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  *Malice shall not be imputed to a person based solely on his or her participation in a crime*."  (§ 188, subd. (a)(3), italics added.)  The change reflects the Legislature's intent that "[a] person's culpability for murder must be premised upon that person's own actions and subjective mens rea."  (Stats. 2018, ch. 1015, § 1, subd. (g).)

Additionally, section 189 previously stated, "All murder … which is committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or any act punishable under Section 206, 286, 288, 288a, or 289, or any murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree."  Senate Bill 1437 amended section 189, in part, by adding subdivision (e), which provides:

> "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven:  [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."

13.

The legislation also added section 1172.6 (former § 1170.95), which provides a procedure by which defendants whose cases are final can seek retroactive relief if the changes in the law would affect their previously sustained convictions. (Stats. 2018, ch. 1015, § 4.) Initially, this section permitted those "convicted of felony murder or murder under a natural and probable consequences theory [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts …." (Stats. 2018, ch. 1015, § 4, subd. (a).) In Senate Bill No. 775 (2021–2022 Reg. Sess.), effective January 1, 2022, the Legislature amended the language of section 1172.6 to expand the scope of the petitioning procedure to defendants convicted of attempted murder or manslaughter under a now prohibited theory.

Pursuant to amended section 1172.6, upon receiving a petition, if the petitioner has requested counsel, the court must appoint counsel to represent the petitioner. (§ 1172.6, subd. (b)(3).) "After the parties have had an opportunity to submit briefings, the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief." (§ 1172.6, subd. (c).) If the petitioner has made such a showing entitling relief, the court "shall issue an order to show cause." (*Ibid.*) "Within 60 days after the order to show cause has issued, the court shall hold a hearing to determine whether to vacate the murder, attempted murder, or manslaughter conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (§ 1172.6, subd. (d)(1).)

If, at the hearing, the prosecution fails to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019, "*the prior conviction, and any allegations and enhancement attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges*." (§ 1172.6,

14.

subd. (d)(3), italics added.) "The petitioner's conviction shall be redesignated as the target offense or underlying felony for resentencing purposes if the petitioner is entitled to relief pursuant to this section, murder or attempted murder was charged generically, and the target offense was not charged. Any applicable statute of limitations shall not be a bar to the court's redesignation of the offense for this purpose." (§ 1172.6, subd. (e.).) "Section 1172.6, subdivision (e), neither defines 'target offense or underlying felony' nor specifies the process by which the court should identify that offense or felony." (*People v. Arellano* (2022) 86 Cal.App.5th 418, 432, review granted Mar. 15, 2023, S277962; accord, *People v. Howard* (2020) 50 Cal.App.5th 727, 737.) However, courts have interpreted this phrase to mean "the 'offense' upon which liability was based for either the natural and probable consequences doctrine or the felony-murder rule." (*Arellano, supra*, at p. 435; accord, *Howard*, *supra*, at p. 737.)

## II. Analysis

Defendant contends the court erred in redesignating the attempted murder convictions as assaults on peace officers and evading police because the jury convicted her of "what was alleged to be the target offenses underlying the attempted murder convictions, which were robberies." She asserts the jury was instructed under the natural and probable consequences doctrine that it could convict her of attempted murder upon a finding (1) a robbery was committed; (2) defendant aided and abetted the robbery; and (3) a coprincipal in the offense committed attempted murder. She argues, because she was convicted of the underlying and target offenses—robberies—the court erred in redesignating the attempted murders as nontarget offenses—two counts of assault with a firearm on a peace officer and one count of evading a peace officer. Accordingly, the convictions on those counts must be dismissed. Alternatively, she contends insufficient evidence supports a finding she aided and abetted the assaults with a firearm on the police officers (counts 36 and 37), relying in part on the trial court's initial statements

15.

that there was no evidence she "encouraged the shooting or did anything to make the shooting easier" and that she did nothing but try to "get away rather than aiding or abetting or encouraging [Silva] to fire the weapon."

The People concede "the target offense for purposes of the natural and probable consequences instruction read to her jury on the attempted murder counts was robbery." They also agree with defendant's contention "she was charged with (and convicted of) three counts of robbery." However, they argue defendant's "culpability in these crimes extended far beyond just the robbery counts." They assert it was "undisputed" defendant "acted as the getaway driver from the robbery and drove the getaway vehicle through a seven- to 10-minute high-speed police chase in which she ran stop signs and stop lights, and which culminated in one of her codefendants firing a weapon at two officers in a patrol car." They argue, "[t]hus, by redesignating the attempted murder of a peace officer counts as assaults on a peace officer with a firearm—which does not require intent to kill (§ 245, subd. (d)(1))—and by adding a felony evasion count, the trial court was acting in accordance with the purpose of section 1172.6 to ensure that [defendant] was punished commensurate with her individual criminal culpability, and not more." They also contend sufficient evidence supports both convictions of assault on a police officer, asserting the natural and probable consequences doctrine "remains a valid theory of liability for other offenses."

We conclude the court erred in redesignating defendant's attempted murder convictions as two counts of assault on a peace officer and felony evasion.

Initially, the issue before us turns on the interpretation of section 1172.6, subdivisions (d)(3) and (e). "The proper interpretation of a statute is a question of law we review de novo." (*People v. Lewis* (2021) 11 Cal.5th 952, 961.) " " " " "As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.] We begin by examining the statute's words, giving them a plain and commonsense meaning." " " " " "

16.

(*Ibid*.) "'"[W]e look to 'the entire substance of the statute … in order to determine the scope and purpose of the provision …. [Citation.]' [Citation.] That is, we construe the words in question '"in context, keeping in mind the nature and obvious purpose of the statute …." [Citation.]' [Citation.] We must harmonize 'the various parts of a statutory enactment … by considering the particular clause or section in the context of the statutory framework as a whole.'"'" (*Ibid*.)

In reviewing the plain language of section 1172.6, subdivisions (d)(3) and (e), we agree with defendant's first contention—because it is undisputed the target offenses were charged (and defendant was convicted thereof), the statute required the court to resentence defendant on the remaining charges. It did not permit the court to redesignate the attempted murder convictions to assaults with a firearm on a peace officer and felony evading a police officer. That is, section 1172.6, subdivision (d)(3) provides that when an attempted murder conviction is no longer valid under the amended law, the prior conviction "shall be vacated and the petitioner shall be resentenced on the remaining charges." (§ 1172.6, subd. (d)(3).) Relevant here, "[t]he petitioner's conviction *shall be redesignated as the target offense or underlying felony for resentencing purposes if* the petitioner is entitled to relief pursuant to this section, murder or attempted murder was charged generically, and *the target offense was not charged*." (§ 1172.6, subd. (e), italics added.) But, because here the target offenses were charged, section 1172.6, subdivision (e)'s redesignation procedure did not apply. Indeed, to hold otherwise would avoid the plain meaning of the language of the statute and render meaningless the conditional language of section 1172.6, subdivision (e).

Said differently, section 1172.6 does not provide a procedure by which the court could redesignate the attempted murder convictions to other offenses in this case because the target offenses were charged (and defendant was convicted thereof). Rather, it expressly directs the trial court to vacate the attempted murder convictions and sentence the defendant "on the remaining charges." Thus, the court exceeded its statutory

17.

authority by redesignating the attempted murder convictions as assaults with a firearm on a peace officer and felony evading of a police officer.

The authorities the People rely upon are inapposite. They all discuss the discretion afforded to a court in redesignating a conviction that is now invalid as a result of the changes to sections 188 and 189 effective January 1, 2019, where the target or underlying offenses *were not* charged as necessary to trigger the application of subdivision (e) of section 1172.6. We discuss each of them in turn.

In *People v. Howard*, *supra*, 50 Cal.App.5th 727 (*Howard*), the defendant and two of his codefendants were charged with the murder of a woman shot and killed during a burglary of her home in 2010. (*Id*. at pp. 729, 731–732.) The defendant was convicted of first degree murder with a felony-murder special circumstance, and the jury found he had been armed in the commission of the offense. (*Id*. at pp. 729–730, 732.) On direct appeal, the felony-murder special circumstance was reversed because the evidence was insufficient to show the defendant (who was not the actual killer) acted with reckless indifference to human life. (*Id*. at pp. 730, 733.) The defendant then moved to vacate his murder conviction and for resentencing pursuant to former section 1170.95, now section 1172.6. (*Howard*, at pp. 730, 733.) The parties agreed the defendant's murder conviction should be vacated and that the underlying felony was burglary, but they disagreed on the degree of the offense. (*Id*. at pp. 730, 733–734.) The court vacated the defendant's murder conviction and redesignated it as first degree burglary plus a one-year arming enhancement under section 12022, subdivision (a)(1). (*Howard*, at pp. 730, 734.)

On appeal, the *Howard* court held "the court properly redesignated the underlying felony as first degree burglary pursuant to [former] section 1170.95, subdivision (e) because the evidence at trial established—beyond dispute—that defendants burglarized a residence," and that doing so did not violate defendant's constitutional rights. (*Howard*, *supra*, 50 Cal.App.5th at p. 730; see *id.* at pp. 738, 740.) The *Howard* court explained, "the plain language of [former] section 1170.95, subdivision (e) contemplates a situation

18.

where—as here—the underlying felony was not charged." (*Id*. at p. 738.) And, comparing that provision with former section 1170.95, subdivision (d)(3) supports the conclusion "the Legislature intended to grant the trial court flexibility when identifying the underlying felony *for resentencing under subdivision (e)*." (*Howard*, at p. 739, italics added.) The *Howard* court held, "[b]y vacating Howard's murder conviction and designating that conviction as first degree burglary, the court calibrated Howard's punishment to his culpability for aiding and abetting a residential burglary." (*Ibid*.) It further confirmed the court properly designated the offense a violent felony and imposed a one-year arming enhancement "because the evidence established those enhancements relative to the underlying felony, burglary." (*Id*. at p. 742; see *id*. at pp. 730, 740–742; but see *People v. Arellano*, *supra*, 86 Cal.App.5th at p. 436 [concluding § 1172.6, subd. (e) does not permit court to add enhancements in redesignating vacated conviction; rather specific language states, "'for resentencing purposes,' the newly redesignated conviction shall include only the offense upon which liability for murder or attempted murder was based"], review granted.)

In *People v. Silva*, *supra*, 72 Cal.App.5th 505 (*Silva*), the defendant was convicted in a jury trial with two codefendants of two counts of first degree murder arising out of a home invasion robbery. (*Id*. at pp. 509–513.) He successfully petitioned for resentencing under former section 1170.95, now section 1172.6. (*Silva*, at pp. 510, 513.) In redesignating the defendant's convictions under former section 1170.95, subdivision (e), the court vacated the two murder convictions and resentenced the defendant on six home invasion robberies or attempted robberies based on the number of robbery victims alleged in the original information. (*Silva*, at pp. 510, 515.) On appeal, the defendant challenged his sentence, asserting it was constitutional error under the Fifth, Sixth, and Fourteenth Amendments to impose sentence upon him for six robbery offenses of which he was never found guilty by a jury. (*Silva*, at p. 517.) He also argued his murder convictions

should have been redesignated as generic, second degree robberies rather than home invasion robberies in concert. (*Id.* at p. 518.)

The *Silva* court held, in part, there was "no statutory impediment to the imposition of sentence on more counts on resentencing under [former] section 1170.95, subdivision (e) than the number of murder convictions originally sustained." (*Silva*, *supra*, 72 Cal.App.5th at p. 531.) The *Silva* court also concluded "the federal and state Constitutions pose no bar to the redesignation of additional counts, so long as the petitioner receives notice, an opportunity to be heard, and the prosecution bears its burden of proving guilt on the redesignated counts." (*Silva*, at p. 532.) It reasoned, "[s]ubdivision (e) of [former] section 1170.95 appears to invest the superior court with considerable discretion in redesignating the petitioner's murder convictions as underlying felonies and resentencing a petitioner to an appropriate term of years based on his or her individual culpability." (*Ibid.*) Accordingly, "the court may consider the full extent of the petitioner's criminal conduct, and the redesignation may reflect, among other things, the number of crime victims, not just the number of murder charges on which the petitioner was convicted. [Citation] The focus is on achieving a just sentence—not making sure the redesignated offenses line up numerically with the vacated murder convictions." (*Ibid.*)

The *Silva* court further rejected the defendant's claim the court could not redesignate the vacated convictions to "past alleged crimes that remain unadjudicated" reasoning, "[i]n cases in which the underlying felony or target offense was never charged, the resentencing judge necessarily must identify the appropriate redesignated offense and make factual findings on the petitioner's guilt." (*Silva*, *supra*, 72 Cal.App.5th at p. 530.) Accordingly, "[i]if a judge may redesignate a murder as a crime that was never charged, as is implicit in subdivision (e), we see no reason why he or she cannot redesignate a murder as a charge once made but dropped in circumstances where the dismissal was not for lack of evidence, but in reliance on the felony-murder rule then in effect." (*Ibid.*)

The *Silva* court further rejected the defendant's claim the court could not redesignate his murder convictions as first degree robberies (rather than generic second degree robberies), relying upon the conclusion in *Howard*, *supra*, 50 Cal.App.5th at pages 738–740, that "a resentencing court could redesignate a vacated murder conviction as a lesser offense commensurate with [the defendant's] participation in the underlying felony, not just generically, but with the petitioner's individual culpability in mind based on the evidence at trial." (*Silva*, at p. 519.) The *Silva* court expanded, "[w]hat *Howard* did not say explicitly, but what it authorized in practice, was factfinding by the resentencing judge, something we believe is implicit in the redesignation process." (*Id.* at p. 520.) The *Silva* court also agreed with the defendant that due process requires notice and an opportunity to be heard on any request by the prosecution to designate an unadjudicated offense for resentencing under subdivision (e) of former section 1170.95 (now § 1172.6), reasoning in part the "subdivision (e) proceeding is not simply a resentencing, but also a redesignation of one or more criminal offenses which mimics a criminal conviction." (*Id.* at p. 523; see *id.* at pp. 520–524.) It concluded the defendant was given the requisite notice and not deprived of the opportunity to be heard before he was resentenced. (*Id.* at pp. 525–526.)

In *People v. Watson* (2021) 64 Cal.App.5th 474 (*Watson*), the defendant was convicted by plea of second degree murder in 1988, and he moved to vacate his conviction and be resentenced under former section 1170.95 in 2019. (*Watson*, at pp. 477–478.) The trial court found the defendant was entitled to relief under former section 1170.95, vacated his murder conviction, and redesignated that conviction as two offenses: first degree burglary and first degree robbery. (*Watson*, at pp. 477, 480.) It sentenced the defendant to six years on the burglary conviction and imposed but stayed execution of a sentence on the robbery conviction pursuant to section 654. (*Watson*, at pp. 477, 480.)

On appeal, the *Watson* court rejected the defendant's argument the plain language of former "section 1170.95, subdivision (e) requires a court 'to select one felony as the

designated underlying offense, and sentence him only as to that one.'" (*Watson*, *supra*, 64 Cal.App.5th at p. 483.)  Rather, it concluded, "the trial court did not err in designating Watson's vacated murder conviction as both first degree burglary and first degree robbery pursuant to [former] section 1170.95, subdivision (e)." (*Id*. at p. 492.)  The *Watson* court relied, in part, on section 7 to conclude the Legislature's use of the singular form of the phrase "underlying felony" in subdivision (e) "was not necessarily intended to restrict courts to designating only one underlying felony under [former] section 1170.95, subdivision (e)." (*Watson*, at p. 485.)  Rather, "[t]he plain language of the statute … confirms that the Legislature did not intend to require courts to designate only one felony in all cases." (*Id*. at p. 487.)  Additionally, the "evidence establishes beyond a reasonable doubt that Watson aided and abetted both a burglary and a robbery prior to [the] killing." (*Id*. at p. 486.)  The *Watson* court further stated it "agree[d] with the *Howard* court's reasoning that reading [former] section 1170.95, subdivisions (d)(3) and (e) together reflects a legislative intent to grant trial courts flexibility in designating the underlying offense for resentencing purposes." (*Id.* at p. 488.)  And, concluding "subdivision (e) requires a court to redesignate a vacated murder conviction as only one underlying felony—even when the evidence shows beyond dispute the commission of more than one underlying felony—would run directly contrary to this principle." (*Ibid*.) The *Watson* court further held, the trial court calibrated the defendant's punishment to his culpability for committing both of those crimes, and to prohibit it from doing so on the facts of the case "would run contrary to the express purposes of the statute." (*Id*. at p. 492.)

Notably, these cases provide that the court has varying degrees of discretion in redesignating the invalid conviction(s) *under section 1172.6, subdivision (e)*, where the target or underlying offense was not charged and the defendant was not convicted thereof.  (See *Silva*, *supra*, 72 Cal.App.5th at p. 530 ["In cases in which the underlying felony or target offense was never charged, the resentencing judge necessarily must

identify the appropriate redesignated offense and make factual findings on the petitioner's guilt"].)  But, as discussed, section 1172.6, subdivision (e) was not triggered here because the target or underlying offense, robbery, *was charged*.  Rather, here, the court erred in failing to simply vacate the attempted murder convictions and resentence defendant on the remaining charges as required by the plain language of section 1172.6, subdivision (d).

Accordingly, we conclude defendant's first contention has merit and the trial court's order must be reversed on that basis.

## DISPOSITION

The order is reversed and the matter is remanded for resentencing consistent with this opinion.

PEÑA, J.

WE CONCUR:

LEVY, Acting P. J.

SNAUFFER, J.

23.